OPINION
{¶ 1} Defendant-appellant Mavis Wingard appeals from the judgment of the Greene County Court of Common Pleas, Domestic Relations Division, overruling her objections to the magistrate's decision and adopting the magistrate's decision. Mrs. Wingard contends that the trial court erred in failing to conduct an independent and de novo review of the magistrate's decision and order when it perfunctorily overruled Mrs. Wingard's twenty-one objections without analysis. We conclude that the trial court did not defer to the decision of the magistrate to a degree ordinarily associated with an appellate review standard and incompatible with the de novo review required by Civ.R. 53(E)(4)(b). We conclude that the trial court did not err in failing to conduct a de novo review of the magistrate's decision and order when, after considering Mrs. Wingard's objections, it overruled them and adopted the magistrate's decision.
 {¶ 2} Mrs. Wingard contends that the trial court erred in failing to order a shared parenting plan and in naming Mr. Wingard the residential parent and legal custodian. We conclude that the magistrate's findings, as adopted by the trial court, are supported by the record and the trial court did not err in refusing to order a shared parenting plan and in naming Mr. Wingard the residential parent and legal custodian.
 {¶ 3} Mrs. Wingard contends that the trial court erred in failing to distribute the marital property and debt equitably. After reviewing the record, we conclude that the trial court did not err in failing to equitably distribute the marital property and debt.
 {¶ 4} Mrs. Wingard contends that the trial court erred in its calculation of child support by failing to consider the adoption subsidy Mr. Wingard receives each month. We find that the trial court did consider the adoption subsidy when it included the adoption subsidy as "other annual income" in the child support computation worksheet attached to its judgment entry and decree of divorce. We conclude that the trial court did not err in its calculation of child support.
 {¶ 5} Mrs. Wingard contends that the trial court erred to her prejudice in failing to rule upon her pending contempt motions. Because the trial court did not rule on Mrs. Wingard's pending contempt motions, this court lacks jurisdiction over these issues for want of a final appealable order.
 {¶ 6} Accordingly, the judgment and decree of divorce is Affirmed, and Mrs. Wingard's appeal is dismissed as to her pending contempt motions.
 I {¶ 7} Mavis and Curtis Wingard were married in 1993, and have one adopted child together, Shawn Wingard, born February 7, 1998. Mr. Wingard filed a complaint for divorce in February, 2001. At that time, both parties worked for the Ohio Department of Corrections. Mr. Wingard grossed a salary of $65,434 a year, and Mrs. Wingard grossed a salary of $52,851. Mr. Wingard also made approximately $1,000 a year working for a program called Upward Bound.
 {¶ 8} After a final divorce hearing, the magistrate filed a decision and order granting the divorce and finding that it was in the best interest of Shawn that Mr. Wingard be named the residential parent and legal custodian. The magistrate found that a shared parenting plan would not be in Shawn's best interest, because the parties are unable to communicate. The magistrate found that Mrs. Wingard would be entitled to a standard order of parenting time and ordered that she pay $564.56 per month plus a 2% processing fee for child support.
 {¶ 9} Regarding property division, the magistrate awarded the Ford Expedition, which was financed with a second mortgage on the marital real estate, to Mr. Wingard, finding that Mrs. Wingard was entitled to one-half of the equity, in the amount of $5,107.50. The magistrate also found that Mr. Wingard removed $5,919.55 from a custodial account that the parties had established for Shawn, and that Mrs. Wingard was entitled to one-half of the account, in the amount of $2,959.78. The magistrate found that $6,800 in cash kept in the home was joint marital property, because there was insufficient evidence that the money was a gift from Mrs. Wingard's father. The magistrate found that part of the money was used to purchase a new heat pump for the marital residence and the remainder was used to pay for the purchase of a tractor for the residence. The magistrate found that Mrs. Wingard was entitled to her share of the equity in the tractor. The magistrate found that Mr. Wingard purchased a new tractor for $10,000 by trading in an old tractor of the parties worth $3,500, by selling a Cadillac he had prior to the marriage for $3,500, and by using part of the $6,800 in cash. The magistrate found that Mrs. Wingard was entitled to $3,250, one-half of the value of the tractor less the $3,500 in pre-marital monies. The magistrate further found that Mr. Wingard withdrew $1,500 from a joint checking account, and that Mrs. Wingard was entitled to $750 of the withdrawn money.
 {¶ 10} Regarding personal property, the magistrate found that the parties had divided their personal property by providing a list of assets and splitting the property by a coin toss in court. The magistrate did not grant Mrs. Wingard's later request for further monies as an award of personal property, finding that all property should have been listed at the time of the coin toss.
 {¶ 11} Regarding real estate, the magistrate found that the ten acres of land on which the marital residence is located was not a marital asset. The magistrate concluded that the land was given to Mr. Wingard by his father prior to the marriage and that there was no evidence that it was intended to be a gift to both Curtis and Mavis. Although three appraisals were conducted by three different entities, the magistrate found the appraisal by Sheridan Associates, as ordered by the court, to be the most realistic and appraised the value of the residence at $205,000. The magistrate awarded the marital residence to Mr. Wingard and found that the equity in the home was to be divided equally by the parties. The magistrate determined that the equity in the residence amounted to $33,127.53 after the first mortgage in the amount of $122,145.79 and the second mortgage in the amount of $49,726.68 were deducted from the $205,000 appraisal value. The magistrate found that because Mrs. Wingard failed to pay the second mortgage, in the amount of $16,632, as previously ordered by the court, Mrs. Wingard was not entitled to her half of the equity in the house, which would have amounted to $16,563.77.
 {¶ 12} The trial court's approval and adoption of the magistrate's decision was filed along with the magistrate's decision and order. Thereafter, Mrs. Wingard filed twenty-one objections to the magistrate's decision and order. After considering each of Mrs. Wingard's objections, the trial court found them to be without merit. The trial court then approved and adopted the magistrate's decision and order, and ordered Mr. Wingard's counsel to prepare and submit the final decree within thirty days for approval by the court. Thereafter, a judgment entry and decree of divorce, signed by both parties, was entered adopting the magistrate's decision in full. The specifics of the decree were set forth and were consistent with adoption of the magistrate's decision. The decree also reserved Mrs. Wingard's right to prosecution of pending contempt motions she had filed. From the trial court's decision overruling her objections to the magistrate's decision and adopting the magistrate's decision, Mrs. Wingard appeals.
 II {¶ 13} Mrs. Wingard's first assignment of error is as follows:
 {¶ 14} "THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO DEFENDANT-APPELLANT BY NOT PERFORMING AN INDEPENDENT, DE NOVO REVIEW OF THE MAGISTRATE'S `DECISION AND ORDER' AS REQUIRED BY CIV.R. 53."
 {¶ 15} Mrs. Wingard contends that the trial court erred in failing to conduct an independent and de novo review of the magistrate's decision and order when it perfunctorily overruled Mrs. Wingard's twenty-one objections without analysis. Mrs. Wingard contends that in Quick v. Kwiatkowski, Montgomery App. No. 18620, 2001-Ohio-1498, 2001 WL 871406, we required that a trial court demonstrate its analysis and show its de novo review of a magistrate's decision. Mrs. Wingard also contends that inQuick, we found it inappropriate to presume that a trial court performed an independent and de novo review of the magistrate's decision.
 {¶ 16} Mrs. Wingard's contentions are incorrect. In Quick,
we merely stated that a trial court could not apply an appellate standard of review when reviewing a magistrate's decision, and that it was inappropriate for a trial court to presume the correctness of a magistrate's decision. See Quick, supra, at *3. We stated as follows:
 {¶ 17} "Magistrates are neither constitutional nor statutory courts. Magistrates and their powers are wholly creatures of rules of practice and procedure promulgated by the Supreme Court. Therefore, magistrates do not constitute a judicial tribunal independent of the court that appoints them. Instead, they are adjuncts of their appointing courts, which remain responsible to critically review and verify the work of the magistrates they appoint." Quick, supra, at *3, citation omitted. "Civ.R. 53(E)(4)(b) contemplates a de novo review of any issue of fact or law that a magistrate has determined when an appropriate objection is timely filed. The trial court may not properly defer to the magistrate in the exercise of the trial court's de novo
review. The magistrate is a subordinate officer of the trial court, not an independent officer performing a separate function." Id., at *4.
 {¶ 18} We further stated that "[t]he `abuse of discretion' standard that the trial court applied to review the decision of its magistrate is an appellate standard of review. It is applicable to the review performed by a superior court of the judgments and orders of inferior courts. Inherent in the abuse of discretion standard are presumptions of validity and correctness, which acknowledge the independence of the inferior courts by deferring to the particular discretion they exercise in rendering their decisions. Because its magistrate does not enjoy that independence, such presumptions are inappropriate to the trial court's review of a magistrate's decisions. Therefore, a trial court errs when it applies the abuse of discretion standard of review in ruling on Civ.R. 53(E)(3) objections to the decision of the appointed magistrates * * *." Quick, supra, at *3. We concluded that "[t]he trial court errs when it employs an appellate standard of review in ruling on objections to the decisions of its own magistrate, because an appellate court is then prevented from conducting an appropriate review of the discretionary choice the trial court made when it adopted its magistrate's decision. Reversal and an order of remand for a proper review are then required." Id., at *4.
 {¶ 19} Here, the trial court did not employ an abuse of discretion standard or defer to the decision of the magistrate to a degree ordinarily associated with an appellate review standard and incompatible with the de novo review required by Civ.R. 53(E)(4)(b). After considering each of Mrs. Wingard's objections, the trial court found them to be without merit. The trial court approved and adopted the magistrate's decision and order, and ordered Mr. Wingard's counsel to prepare and submit the final decree within thirty days for approval by the court. The trial court's entry overruling Mrs. Wingard's objections was entered approximately nine months after her objections were filed, representing a sufficient time within which to conduct a de novo review. Approximately six months later, a judgment entry and decree of divorce, signed by both parties, was entered adopting the magistrate's decision in full. The specifics of the decree were set forth and were consistent with adoption of the magistrate's decision.
 {¶ 20} In Quick, we stated that "[f]ormerly, Civ.R. 53(E) required a trial court in every case to make an independent review of the magistrate's decision, and then make its own determination. The rule was amended, effective July 1, 1996. Paragraph (4) of Civ.R. 53(E) now states, inter alia: `The court may adopt the magistrate's decision if no written objections are filed unless it determines that there is an error of law or other defect on the face of the magistrate's decision.' This new rule confers discretion on the court to adopt the magistrate's decision summarily when no objections are filed. However, when objections are filed, Civ.R. 53(E)(4)(b) mandates that `[t]he court shall rule on any objections.' It may then adopt, reject, or modify the magistrate's decision or recommit the matter to the magistrate.'" Quick, supra, at *2, internal citations omitted.
 {¶ 21} We conclude that the record fails to portray the error assigned: that the trial court erred by failing to conduct a de novo review of the magistrate's decision and order when after considering Mrs. Wingard's objections, it overruled them and adopted the magistrate's decision.
 {¶ 22} Mrs. Wingard's first assignment of error is overruled.
 III {¶ 23} Mrs. Wingard's second assignment of error is as follows:
 {¶ 24} "THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO DEFENDANT-APPELLANT IN THE ALLOCATION OF PARENTAL RIGHTS AND RESPONSIBILITIES."
 {¶ 25} Mrs. Wingard contends that the trial court erred in failing to order a shared parenting plan and in naming Mr. Wingard the residential parent and legal custodian.
 {¶ 26} A shared parenting plan was found not to be in Shawn's best interest because the parties are unable to communicate. Specifically, it was noted that the parties "have been communicating by letters left in the child's luggage during the parenting times. It appears that Curtis Wingard does not fully communicate with Mavis as to the child's school information, extracurricular activities, and medical appointments. There were several times during parenting time exchanges that Curtis Wingard failed to show and there was a time when Mavis Wingard would not allow Curtis's mother to pick the child up. Therefore, it is clear that a Shared Parenting Plan would not work between the parties."
 {¶ 27} Mr. Wingard testified that he tries to make the parenting time exchanges as smooth as possible, but there is friction. He testified that "primarily, as far as communication, there isn't any." Mr. Wingard testified that he tries to communicate with Mrs. Wingard, but to no avail. He testified that he leaves notes in Shawn's suitcase to communicate with Mrs. Wingard. He testified that he tries to be informative about Shawn in the notes and that he leaves a note on the bottom that she can feel free to call if she has any questions. He testified that she did call a couple of times regarding visitation, but not to check up on Shawn. Mrs. Wingard testified that she tries to communicate with Mr. Wingard and that Mr. Wingard will listen to her talk but will not respond. She testified that their communication is through notes left by Mr. Wingard in Shawn's suitcase.
 {¶ 28} One factor to be considered in determining whether shared parenting is in the best interest of the child is the ability of the parents to cooperate. R.C. 3109.04(F)(2)(a). Based on the foregoing testimony by Mr. and Mrs. Wingard, we conclude that the evidence in the record supports the finding that a shared parenting plan is not in Shawn's best interest, because the parties are unable to communicate or cooperate.
 {¶ 29} Mr. Wingard was named the residential parent and legal custodian based on many factors. The magistrate found that Mrs. Wingard was the primary parent for Shawn since his adoption, but that Mr. Wingard has been the primary parent since their separation. The magistrate found that Mr. Wingard successfully takes Shawn to doctor visits and extracurricular activities. The magistrate found that there is no concern over the physical health of either party, but some concern over the mental health of Mrs. Wingard. The magistrate noted that Mrs. Wingard missed seven months of work due to depression, during which time Mr. Wingard took Shawn to daycare. The magistrate found that Shawn's room at his father's house was not decorated in a child's theme, like at his mother's house in Chillicothe. However, the magistrate noted that Shawn was not familiar with the new home in Reynoldsburg where Mrs. Wingard was planning on relocating. The magistrate found that there was no evidence that Mrs. Wingard had any relatives in the general area of Reynoldsburg. The magistrate found that Shawn was better adjusted to the Xenia and Greene County community, where Shawn attends the Nazarene School. The magistrate noted that Mr. Wingard's parents live in close proximity to his residence and help take care of Shawn. The magistrate also found that Shawn appears to be a well cared for and happy child.
 {¶ 30} Mrs. Wingard argues that she was the primary caregiver for Shawn from the time of adoption and that her home is more conducive to child rearing. The evidence does show that Mrs. Wingard was the primary caregiver for Shawn from the time of adoption, but also supports the magistrate's finding that Mr. Wingard has been the primary caregiver since the separation. Mr. Wingard takes Shawn to and from daycare, doctor appointments, and extracurricular activities. Although there is evidence that Shawn's room does not have a child's theme to it, the record shows that Mr. Wingard plays with Shawn at home and includes educational activities.
 {¶ 31} Mrs. Wingard argues that her mental health was unfairly weighed against her. However, Mrs. Wingard did testify that she missed seven months of work due to depression because of her father's terminal illness and Mr. Wingard's announcement that he wanted a divorce. Mrs. Wingard also testified that Mr. Wingard placed Shawn in daycare during this time, although Mrs. Wingard disagreed with that decision. We conclude that the magistrate appropriately considered "some concern" over Mrs. Wingard's mental health.
 {¶ 32} Mrs. Wingard argues that the magistrate failed to consider that Mr. Wingard has denied her visitation, has raided Shawn's college fund, and does not properly care for Shawn in terms of his asthma treatment and car safety.
 {¶ 33} Mrs. Wingard testified that Mr. Wingard has been late by five to fifteen minutes when exchanging Shawn. Mr. Wingard did admit that on a few occasions he was five to ten minutes late, but that he was usually early. Mr. Wingard testified that he has a twenty-five to thirty-five minute drive and that on occasion there is construction work in progress. Mrs. Wingard did testify that there were a couple of occasions where Mr. Wingard failed to bring Shawn for visitation. The magistrate did recognize these occurrences in denying the shared parenting plan based on the parties' inability to communicate. We do not conclude that these few occurrences amount to a willful denial of visitation, as alleged by Mrs. Wingard.
 {¶ 34} Regarding the custodial account, Mr. Wingard did testify that he closed the account, but stated that he used the funds to pay expenses for Shawn, including household expenses, clothing, food, daycare, and doctor visits. The magistrate also found that Mrs. Wingard was entitled to one-half of the account, in the amount of $2,959.78.
 {¶ 35} Regarding Shawn's health and safety, Mr. Wingard testified that he is very familiar with Shawn's asthma plan and understands the directions from his doctor concerning treatment of his asthma. Mr. Wingard testified that Shawn currently takes one pill a day for his asthma and that a breathing treatment is used if wheezing occurs. He testified that medication is used with the breathing treatment and that a mask is put on Shawn for three minutes. He testified that Shawn's asthma treatment primarily consists of one Singulair tablet each morning. There is no evidence in the record that Mr. Wingard has improperly treated Shawn's asthma. Mr. Wingard also testified that he still requires Shawn to be in a car seat with a seat belt on, indicating that proper safety measures are being used.
 {¶ 36} We conclude that the magistrate's findings, as adopted by the trial court, are supported by the record and that the trial court did not abuse its discretion in refusing to order a shared parenting plan and in naming Mr. Wingard the residential parent and legal custodian.
 {¶ 37} Mrs. Wingard's second assignment of error is overruled.
 IV {¶ 38} Mrs. Wingard's third assignment of error is as follows:
 {¶ 39} "THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO DEFENDANT-APPELLANT BY NOT DISTRIBUTING MARITAL PROPERTY AND DEBT EQUITABLY."
 {¶ 40} Mrs. Wingard contends that the trial court erred in failing to equitably distribute the marital property and debt. Mrs. Wingard contends that the trial court erred in finding that the ten acres of land on which the marital residence is located is not a marital asset. Mrs. Wingard argues that Mr. Wingard received the land from his father in exchange for work he did after they were married and, therefore, the land constituted the fruits of his marital labor, making the land a marital asset.
 {¶ 41} We agree with the trial court that the land was given to Mr. Wingard by his father prior to the marriage and that there was no evidence that it was intended to be a gift to both spouses. Mrs. Wingard testified that she did not know if Mr. Wingard purchased the land from his father or if it was a gift. Mr. Wingard testified that his father gave him the land in June, 1993, prior to his marriage, as a gift in exchange for doing some work on the land. He testified that the work he did in exchange for the land was during high school and college and a little bit after college. There is no evidence that the work was done during the marriage. Therefore, we conclude that the trial court properly found that the land is not a marital asset and that Mrs. Wingard is not entitled to any equity in the land.
 {¶ 42} Mrs. Wingard contends that the trial court erred in using the lowest appraisal on the marital residence and in deducting the second mortgage from the appraisal.
 {¶ 43} Three appraisals were conducted on the residence by three different entities. In 2002, the Greene County Auditor's Office appraised the residence at $219,860. The parties indicated that the appraisal did not reflect improvements made to the property. Another appraisal was conducted in 2002 by PCS, and the residence was appraised at $270,000. Due to the discrepancies between the first two appraisals, the magistrate ordered a third appraisal to be conducted by Sheridan Associates in July, 2003. Sheridan Associates appraised the residence at $205,000. The magistrate stated that Sheridan Associates were well known in the area for determining the market value of various farms and farm land. Sheridan Associates used a comparable sales approach, looking at four other properties to determine the value of the residence. In September, 2003, the magistrate found the appraisal by Sheridan Associates to be the most realistic and appraised the value of the residence at $205,000. We cannot conclude that the trial court erred in using the appraisal conducted by Sheridan Associates, given that it was the most current appraisal and included improvements made to the property.
 {¶ 44} The magistrate awarded the marital residence to Mr. Wingard and held that the equity in the home was to be divided equally by the parties. The magistrate determined that the equity in the residence amounted to $33,127.53 after the first mortgage in the amount of $122,145.79, and the second mortgage in the amount of $49,726.68, were deducted from the $205,000 appraisal value. Mrs. Wingard was not entitled to her half of the equity in the house, or $16,563.77, because she had failed to pay the second mortgage, in the amount of $16,632, as previously ordered by the court.
 {¶ 45} Equity is defined as the "[v]alue of property * * * over and above the indebtedness against it (e.g., market value of house minus mortgage)." Black's Law Dictionary (6 Ed. 1990) 540. We conclude that the trial court did not err in deducting the second mortgage from the appraisal to determine the equity in the marital residence. We also note that both the first and second mortgage debts were assigned to Mr. Wingard.
 {¶ 46} Mrs. Wingard contends that Mr. Wingard "could not account for $6,800 Mavis kept on hand at the home which she had received from her father's life insurance."
 {¶ 47} We conclude that Mr. Wingard could account for the $6,800. Mr. Wingard testified that the cash was in the house and that it was used to buy a new heat pump for the house and a new tractor. We agree with the magistrate that there was insufficient evidence to establish that this money was a gift from Mrs. Wingard's father. Therefore, the trial court did not err in determining that the $6,800 was joint marital property.
 {¶ 48} Although Mrs. Wingard also contends that Mr. Wingard took money out of a joint bank account, the magistrate recognized this and awarded her half of the withdrawn money.
 {¶ 49} Mrs. Wingard makes several other claims regarding the inequitable distribution of personal property. The magistrate found that the parties divided their personal property by providing a list of assets and splitting the property by a coin toss in court. The magistrate did not grant Mrs. Wingard's later request for further monies toward personal property, ruling that all property should have been listed at the time of the coin toss. We agree. These claims should have been made at the time of the coin toss, when the parties provided a list of the assets.
 {¶ 50} We conclude that the trial court did not fail to equitably distribute the marital property and debt.
 {¶ 51} Mrs. Wingard's third assignment of error is overruled.
 V {¶ 52} Mrs. Wingard's fourth assignment of error is as follows:
 {¶ 53} "THE TRIAL COURT COMMITTED ERROR PREJUDICIAL TO DEFENDANT-APPELLANT BY MISCALCULATING CHILD SUPPORT."
 {¶ 54} Mrs. Wingard contends that the trial court erred in its calculation of child support by failing to consider the adoption subsidy Mr. Wingard receives each month. We conclude that the trial court did consider the adoption subsidy in calculating the child support. Mr. Wingard testified that he receives approximately $1,000 in compensation for his work in the Upward Bound program and that he receives $338 a month in an adoption subsidy. The trial court attached a child support computation worksheet to its judgment entry and decree of divorce, which included $5,056 in "other annual income" and identified it as the adoption subsidy and income from the Upward Bound program. The $5,056 breaks down to $1,000 a year from the Upward Bound program and $338 a month, for twelve months, from the adoption subsidy.
 {¶ 55} Mrs. Wingard also contends that Mr. Wingard failed to produce any proof that he pays $402 a month in work-related child care expenses.
 {¶ 56} Both parties admitted that Shawn is in daycare while they are at work, and Mr. Wingard testified that he has a daycare expense of $402 a month. In the child support computation worksheet, the trial court credited Mr. Wingard with $3,859.20 in annual work-related child care expenses that are approved by the court. This amounts to $321.60 a month in child care expenses, $80.40 less than claimed by Mr. Wingard. We fail to see how Mrs. Wingard is prejudiced by the trial court's use of a lesser amount than that claimed by Mr. Wingard.
 {¶ 57} We conclude that the trial court did not err in its calculation of child support.
 {¶ 58} Mrs. Wingard's fourth assignment of error is overruled.
 VI {¶ 59} Mrs. Wingard's fifth assignment of error is as follows:
 {¶ 60} "THE TRIAL COURT ERRED TO THE MANIFEST PREJUDICE OF APPELLANT BY FAILURE TO HEAR OR RULE UPON CONTEMPT CITATIONS BROUGHT BY DEFENDANT."
 {¶ 61} Mrs. Wingard contends that the trial court erred to her prejudice in failing to rule upon her pending contempt motions.
 {¶ 62} In its judgment entry and decree of divorce, the trial court reserved Mrs. Wingard's right to prosecution of pending contempt motions she had filed. Therefore, these issues have not yet been adjudicated. Because the trial court did not rule on Mrs. Wingard's pending contempt motions, this court lacks jurisdiction over this portion of her appeal, for want of a final appealable order.
 {¶ 63} Accordingly, we dismiss that part of Mrs. Wingard's appeal relating to the contempt motions, for want of a final appealable order.
 VII {¶ 64} Mrs. Wingard's first, second, third, and fourth assignments of error having been overruled, the judgment of the trial court is Affirmed. Mrs. Wingard's appeal is dismissed as to her fifth assignment of error.
Wolff and Young, JJ., concur.
(Hon. Frederick N. Young, Retired from the Court of Appeals, Second Appellate District, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio)